UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE UNITED STATES OF AMERICA      *
                                   *
                                   *
    v.                             *
                                   *
                                   *   Criminal Action No. 14-30010-MGM
OSVALDO VARGAS,                    *
                                   *
                                   *
    Defendant.                     *


MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO SUPPRESS
(Dkt. No. 42)

February 18, 2015

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

On March 8, 2014, Detective Brendan Boyle seized from Osvaldo Vargas ("Defendant") a small "bundle" of heroin, among other items, during a street encounter.[1] On May 1, 2014, a grand jury indicted Defendant for a violation of 21 U.S.C. § 841 (Possession with Intent to Distribute Heroin).[2] (Dkt. No. 2, Grand Jury Indictment 1.) Defendant filed a motion to suppress the evidence on November 12, 2014. (Dkt. No. 42.) The United States ("Government") filed an opposition to this motion on November 26, 2014. (Dkt. No. 47.) A hearing took place over a two-day period, on December 12, 2014 and January 22, 2015.

For the reasons set forth below, the court denies Defendant's motion to suppress.

## II.    FINDINGS OF FACT

---

[1] In addition to the first bundle of heroin, Detective Boyle seized several additional bundles of heroin from Defendant's person, $1,829 in cash, and two cell phones pursuant to a search incident to arrest. The seizure of this additional evidence is not directly contested by Defendant in the instant motion. If the court were to suppress the originally seized bundle of heroin, however, it would follow that the additional evidence must also be suppressed, as it would thereby constitute "fruit of the poisonous tree" resulting from an impermissible search incident to arrest. See generally Wong Sun v. United States, 371 U.S. 471, 487 (1963).

[2] The grand jury further charged that, upon conviction of this offense, the Defendant shall forfeit the $1,829 found on his person, pursuant to 21 U.S.C. § 853. (Dkt. No. 2, Grand Jury Indictment 2.)

On March 8, 2014, at approximately 1:00p.m., Holyoke Police Detectives Brendan Boyle and Jared Hammel turned onto South Bridge Street in Holyoke, Massachusetts. Detective Hammel drove an unmarked gray mini-van while Detective Boyle rode in the passenger seat; both wore plain clothes. The two detectives testified that this contiguous "four-block radius" is an "extremely high crime area," as it has been the site of numerous violent crimes as well as frequent narcotic activity.[3] They also explained the area is "overrun with gang activity." Specifically, the detectives referred to the "La Familia" criminal street gang,[4] which is known for its presence in and around the Lafayette Bar located at 524 South Bridge Street.

As the detectives drove past the Lafayette Bar, they observed four individuals on the sidewalk, three of whom they recognized as La Familia gang members from prior arrests.[5] The detectives were able to visually identify one of these individuals as Osvaldo Vargas ("Defendant") and another as Santiago, who testified for the defense in the motion hearing. The detectives claim they knew these men from prior encounters is bolstered by the fact that Detective Boyle was able to recollect their "street names."[6] Both Santiago and Defendant wore baggy clothing, including sweatshirts with front pockets and loose sweatpants.

The detectives and Santiago all testified that at least some of these individuals had been watching a video on a cell phone. The witnesses differed, however, in their descriptions of Defendant's proximity to Santiago and the rest of the group when the detectives arrived. Specifically, Santiago testified the Defendant was generally nearby, but not directly part of, the group

---

[3] Detective Boyle testified that he has personally made arrests for possession of heroin, cocaine, marijuana, and crack cocaine in this area.

[4] The detectives testified both that this is a dangerous area, with violent and narcotics crime, and that this area is home to the La Familia gang. The detectives also testified about the criminal histories of at least two individual members of La Familia. From this testimony, the court infers that the detectives reasonably believed La Familia to be a violent criminal street gang at the time of this encounter.

[5] The court notes there was no testimony suggesting the detectives had actively been seeking these individuals or investigating a specific police dispatch.

[6] Detective Boyle identified Defendant as "Chi" and Santiago as "Mexico."

watching the video on the cell phone. Based on the evidence presented, the court finds that, at the moment the detectives arrived, the two individuals were sufficiently close in proximity so they reasonably could have been considered to be together for purposes of the instant motion.

The detectives parked the unmarked cruiser on the street near the group of men.[7] Immediately thereafter, yet before either exited the vehicle, both detectives observed behavior leading them to believe the group noticed the detectives' presence in the vicinity. Specifically, one of the individuals began to walk in the direction of the Lafeyette Bar, and went inside. Defendant also walked away along South Bridge Street. A third individual remained in the vicinity. The detectives observed Santiago quickly reach into the front pocket of his sweatshirt.

Detective Hammel discussed this point in detail, testifying that, based on Santiago's hand movement, it seemed as if he may have been holding onto something in his front pocket. Detective Hammel explained he had previously arrested Santiago following a "shots fired call," and he had thereafter recovered two firearms which had been within Santiago's reach. Detective Hammel also stated that, based on his training and experience, he knew individuals possessing firearms frequently keep these firearms in the pockets of their hooded sweatshirts.

As a result of these observations, Detective Hammel exited his vehicle, drew his gun, and approached Santiago while yelling "show me your hands."[8] Though Detective Hammel's gun was withdrawn from its holster, the evidence did not indicate that this gun was ever pointed directly at Santiago. Santiago then lifted his shirt to demonstrate to Detective Hammel that he was unarmed. Upon seeing this motion, Detective Hammel reholstered his firearm. After he conducted a pat-frisk,

---

[7] The precise distance between the group and the vehicle was not specified at the hearing, and there was no evidence of any aggressive or unusual operation of the vehicle which would be relevant to the court's consideration of this motion.

[8] From this testimony, in conjunction with the detectives' testimony pertaining to their prior experience with these individuals and the fact the detectives recognized them, the court infers that at least some of the members of the group recognized the detectives as well, in spite of the detectives' lack of uniforms. This inference is further supported by the fact that two individuals, one of whom was Defendant, dispersed upon seeing the detectives.

3

which revealed that Santiago was not armed, Detective Hammel's inquiry of Santiago ended. Santiago testified that, at this point, he was effectively free to leave.

As Detective Hammel approached Santiago, Detective Boyle simultaneously walked towards Defendant while Defendant walked down South Bridge Street.[9] During his approach, Detective Boyle observed Defendant to be smoking marijuana, thereby violating Holyoke City Ordinance § 54-18.[10] Detective Boyle's observation was supported by his smelling burnt marijuana while in the vicinity of Defendant.[11] Detective Boyle was aware of Defendant's prior arrests for crimes of violence, firearm possession, and drug distribution, including an incident in 2011 or 2012 in which Defendant ran from the police and threw a handgun to the ground which discharged upon impact.[12]

Detective Boyle therefore decided to perform a pat-frisk before issuing a citation for the violation of the marijuana ordinance, as a safety precaution, to determine whether Defendant was in possession of a firearm. Upon patting down Defendant's right-side pants pocket, Detective Boyle felt an object he immediately recognized as a group of bags of heroin held together by a rubber band. Detective Boyle explained he was familiar with these types of heroin "bundles" due to his considerable experience with heroin arrests, as he has been involved in over two hundred.[13] Through

---

[9] The evidence did not indicate that Detective Boyle had his weapon drawn at this time.

[10] The ordinance states, in relevant part,: "Prohibited. No person shall smoke, ingest, or otherwise use or consume marijuana or tetrahydrocannabinol (as defined in G.L c.94C, Sec. 1, as amended) while in or upon any street, sidewalk, public way. . ." HOLYOKE, MASS., ORDINANCE § 54-18 (1997).

[11] The evidence did not indicate whether Detective Boyle attempted to stop Defendant prior to his observations of Defendant smoking marijuana. As explained in Section III(A), infra, however, Defendant's Fourth Amendment protections would be implicated only after Defendant yielded to Detective Boyle's show of authority. See Cal. v. Hodari D., 499 U.S. 621, 626 (1991). There was no evidence presented to suggest Defendant yielded to any show of authority before Detective Boyle possessed probable cause to believe Defendant had violated Holyoke City Ordinance § 54-18.

[12] Detective Boyle also knew that at least one confidential informant had told the Holyoke police that Defendant had been involved in one or more shootings within the past year. However, since the Government did not offer any additional evidence pertaining to the reliability of this tip or other important details, the court does not consider this in its decision. See United States v. Am, 564 F.3d 25, 32 (1st Cir. 2009) (Since the government "failed to provide information regarding the source or reliability" of a tip relied upon by the police in their decision, the First Circuit "excise[d]" evidence of that tip in its "analysis of the officers' decision to approach" the defendant.).

[13] The Government concedes, however, that Detective Boyle has never been technically qualified as an expert. (Dkt. No. 47, Government Memorandum ("Govt. Mem.") 3.)

this experience, Detective Boyle has learned that 10 bags of heroin are frequently held together by a rubber band in the same manner in which Defendant possessed the heroin in question on March 8, 2014.[14]

Detective Boyle then conducted a search incident to an arrest based on the heroin which had been located. In a second pocket, Detective Boyle found another 10 bags of heroin held together in this fashion, along with another two "bundles" containing 20 more bags of heroin, resulting in 38 total bags of heroin in total. All bags were stamped "Walking Dead." Detective Boyle also seized $1,829 from one of Defendant's pockets, and two cell phones at booking.

The drug analysis from the UMASS drug lab confirmed the bags did, in fact, contain heroin. Given this, in conjunction with the fact that the heroin found on the Defendant's person was packaged in a manner intended for sale, the Government concluded that the heroin was intended for distribution.

### III. ANALYSIS

When contraband is seized by officers who do not possess a warrant, the Government "bears the burden of proving the existence of an exception to the Fourth Amendment's warrant requirement." See United States v. Ramos-Morales, 981 F.2d 625, 628 (1st Cir. 1992); accord United States v. McKoy, 402 F. Supp. 2d 313-14 (D. Mass. 2004) (government bears the burden of demonstrating that it had reasonable suspicion to believe defendant may have been armed). Here, to justify the seizure in question, the government must have had legal authority to (1) approach Defendant, (2) stop Defendant, (3) pat-frisk Defendant, and (4) legitimately discover the heroin

---

[14] The Government notes that Defendant was not in possession of any paraphernalia consistent with heroin-use, nor did Defendant possess any of the physical characteristics common to heroin addicts.

"bundle" at issue in the instant motion. Ultimately finding the Government has met its burden, the court denies Defendant's motion to suppress.[15]

### A. Approach of Defendant

As a preliminary matter, it is necessary to determine the point at which Defendant's Fourth Amendment protections were implicated by Detective Boyle's conduct. See generally United States v. Stanley, 915 F.2d 54, 55 (1st Cir. 1990) ("[W]e must first determine the point at which the conduct of Officer Souza became an intrusive stop and search, implicating the protections of the Fourth Amendment."). The Supreme Court has explained a seizure does not actually occur unless and until the suspect yields to the officer's show of authority. See Cal. v. Hodari D., 499 U.S. 621, 626 (1991); accord Britton v. Maloney, 196 F.3d 24, 30 (1st Cir. 1999) ("In order for a seizure to occur, the subject must 'yield' to the assertion of authority over him and thereby have his liberty restrained.").

Therefore, without implicating the Fourth Amendment, officers may patrol public areas and observe individuals' behavior in those public areas. See Stanley, 915 F.2d at 55-56. Further, before Fourth Amendment protections apply, officers may also park their vehicles following their observations, exit, and initiate an approach of those. See id. ("Without implicating the protections of the Fourth Amendment, Officers Souza and Delaney could patrol the parking lot, observe the defendant's behavior from inside or outside their cruiser, and leave their cruiser to approach [him].").

Here, the court observes there has been no evidence presented to suggest Defendant was seized prior to Detective Boyle's exit of the minivan. The court further observes there has been no evidence to suggest Defendant was seized prior to Detective Boyle's observations amounting to probable cause for him to believe Defendant had violated Holyoke City Ordinance § 54-18. See

---

[15] It therefore follows that the search incident to arrest was justified as well. See United States v. Cardona, 903 F.2d 60, 70 n.1 (1st Cir. 1990) ("[O]fficers may seize, incident to a lawful arrest, anything within the arrestee's immediate control in order to protect themselves or preserve evidence.").

6

Hodari D., 499 U.S. at 626 (suspect must yield to an officer's show of authority for a seizure to occur). Therefore, after Detective Boyle exited the minivan, his initial approach of Defendant did not implicate the Fourth Amendment, prior to Defendant's "yield[ing]" to Detective Boyle's authority. See Stanley, 915 F.2d at 55-56.

### B. Stop of Defendant

Officers may briefly and proportionately detain an individual when those officers have probable cause to believe that he has violated a civil ordinance, and this principle applies independent of suspicion of criminal activity. See Whren v. United States, 517 U.S. 806, 819 (1996) (violation of traffic ordinance); McKoy, 402 F. Supp. 2d at 313 n.3 (same). In his memorandum, Defendant concedes that "here, there was. . .the violation of a civil infraction. . ." (Dkt. No. 43, Defendant Memorandum ("Deft. Mem.") 7), specifically Holyoke City Ordinance § 54-18. See HOLYOKE, MASS., ORDINANCE § 54-18 (1997). The court agrees with this statement of fact.

Detective Boyle observed Defendant smoking marijuana, and this observation was supported by the odor of burnt marijuana. The court finds these observations amounted to probable cause for Detective Boyle to believe Defendant violated Holyoke City Ordinance § 54-18. See HOLYOKE, MASS., ORDINANCE § 54-18 (1997). Therefore, Detective Boyle was justified in his brief stop of Defendant.[16] See Whren, 517 U.S. at 819.

### C. Pat-Frisk

Detective Boyle's pat-frisk of Defendant was also justified, pursuant to his objectively reasonable belief that Defendant may have been armed and dangerous at the time Detective Boyle

---

[16] With respect to whether Detective Boyle had probable cause to believe that Defendant had committed a civil infraction, it is irrelevant whether Detective Boyle physically issued a written citation immediately, or at some point thereafter, or not at all. See United States v. Willis, 431 F.3d 709, 717 (9th Cir. 2005) (explaining that it was reasonable for officers to "view any traffic violations as inconsequential in light of [the defendant's] arrest," and that Supreme Court precedent only "require[s] that the officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers [actually] issue citations." (citing United States v. Whren, 53 F.3d 371, 373 (D.C. Cir. 1995), aff'd, 517 U.S. 806 (1996))).

7

approached him. During the course of a legitimate stop, an officer may "frisk an individual if the officer has reasonable suspicion that the person is armed and dangerous." See United States v. Am, 564 F.3d 25 (1st Cir. 2009). This suspicion may exist "regardless of whether [the officer] has probable cause to arrest the individual for a crime." United States v. Knight, 2006 WL 2092416, at *5 (D. Mass. July 26, 2006).

Police need not be certain that an individual is armed or dangerous in order to legally pat-frisk that individual. See Terry v. Ohio, 392 U.S. 1, 27 (1968). Instead, the evidence must only demonstrate that "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. The facts in the moments leading up to the frisk must be analyzed objectively and under the totality of the circumstances known to the officer at the time of the pat-frisk. See United States v. Shaw, 874 F. Supp. 2d 13, 24 (D. Mass. 2012); see also Illinois v. Wardlow, 528 U.S. 119, 127 (2000) (in its evaluation, court must look at "the whole picture" (internal quotation marks and corresponding citation omitted)).

In this analysis, a court may consider an officer's knowledge pertaining to a defendant's prior violent criminal conduct, known gang affiliation, and proclicivity for carrying a firearm. See Am, 564 F.3d at 30; United States v. Osbourne, 326 F.3d 274, 278 (1st Cir. 2003) (defendant "was 'always' armed with a semi-automatic weapon"); see also United States v. Moore, 235 F.3d 700, 703-04 (1st Cir. 2000) (noting that officers' awareness that they were in a "neighborhood known for a high crime rate and drug activity" added to reasonable suspicion). For example, in United States v. Am, the court found a pat-frisk to have been justified because the officers reasonably believed, based on their prior experience with the defendant, that he was likely to have been carrying a weapon, and because the defendant was present in a high-crime area "where gang violence and drug deals frequently occurred" when the frisk occurred. United States v. Am, 2007 WL 465676, at *3 (D. Mass. Feb. 8, 2007), aff'd, 564 F.3d 25 (1st Cir. 2009).

8

Here, most significant to the court's analysis is Detective Boyle's knowledge of a prior encounter with Defendant in which he ran from police and threw a handgun to the ground which discharged upon impact. Since this incident occurred in 2011 or 2012, the court finds it was not so far removed from the date of the incident that it would have been washed from the detectives' memories in their deciding how to proceed on March 8, 2014.

Additionally, Detective Boyle knew Defendant had previously been arrested for violent crimes, as well as possession of illegal firearms. See Osbourne, 326 F.3d at 278. Further, Defendant's baggy, layered attire would have made it difficult for Detective Boyle to decisively ascertain whether Defendant carried a weapon without pat-frisking him. See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (heightened suspicion resulting, in part, from fact that officer could not readily tell whether defendant was armed because he wore loose clothing).

The court also observes that, at the time Detective Boyle made the decision to pat-frisk Defendant, he was likely unaware that Santiago was not armed because his attention was focused solely on Defendant from the moment he exited the car after first seeing Santiago put his hand in his sweatshirt pocket; and, as Santiago explained, Defendant and Santiago were not particularly close to one another when reached by each detective. Therefore, since both Defendant and Santiago were known as members of La Familia, the court accords some weight to the Detective Boyle's observation of Santiago's potentially furtive movement in its evaluation of the reasonableness of Detective's Boyle's conduct towards Defendant.

Also relevant are the following facts: Defendant was known to detective Boyle to be a member of the violent criminal street gang, La Familia, see Am, 564 F.3d at 30; Detective Boyle engaged in his encounter with Defendant alone, see Commonwealth v. Mathieson-Jacob, 2013 WL 4835153, at *4 (Mass. App. Unpub. Sep. 12, 2013) (ratio of officers to suspects during encounter factors into dangerousness analysis); the area in which the encounter occurred was known for

9

violent criminal activity, see Moore, 235 F.3d at 703-04; and the fact that Defendant recognized the detectives and walked away from them adds a very slight degree of heightened suspicion to believe he may have been carrying a weapon. Finally, considering the picture as a whole, the fact that one of the individuals walked into the Lafeyette bar (a hangout for the La Familia) also marginally raised Detective Boyle's objective suspicion of danger. See generally Wardlow, 528 U.S. at 127. In the totality, all these factors render Detective Boyle's belief that Defendant may have been armed objectively reasonable.[17] See Am, 564 F.3d at 30.

Defendant argues Detective Boyle lacked reasonable suspicion to believe he was involved with criminal activity, and he argues Detective Boyle also lacked probable cause to believe a crime had been committed. Defendant therefore condends Detective Boyle did not have the requisite level of cause to legally pat-frisk him. The Government, however, does not contend the pat-frisk was justified merely through probable cause or reasonable suspicion of criminal activity. Instead, the Government asserts the pat-frisk was legitimate due to an objectively reasonable belief that Defendant was armed (Dkt. No. 47, Government Memorandum ("Govt. Mem.") 11), and the court credits this rationale for the reasons articulated above.[18] See id.

### D. Seizure of Object Later Identified to be Heroin

The heroin was lawfully seized pursuant to the "plain-feel" doctrine, which permits an officer who "lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity [as contraband] immediately apparent" to seize the object in question. United

---

[17] Weighing against the Government is the fact that Defendant did not make any furtive movements or gestures at any point. See United States v. Rawnsley, 2009 WL 1292038, at *5 (D.N.H. May 6, 2009). Additionally, though evidence indicated frequent criminal activity occurred in the area, the fact that the events in question occurred in broad daylight weighs somewhat against an objectively reasonable heightened sense of danger. See United States v. Trullo, 809 F.2d 108, 109, 113 (1st Cir. 1987) (acknowledging that, for an encounter which took place at one in the afternoon, the time of day weighs against a finding that an officer's heightened sense of danger was objectively reasonable).

[18] Further, as explained in Section III(B), supra, Detective Boyle possessed probable cause to believe Defendant had violated Holyoke's marijuana ordinance prior to the moment at which the frisk occurred.

10

States v. Proctor, 148 F.3d 39, 43 (1st Cir. 1998) (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)).

In United States v. Schiavo, the First Circuit upheld the suppression of evidence seized during a pat-down search, because the state trooper who conducted the search indicated he was able to determine that the "bulge" in question was contraband only after he had taken the bag from the defendant's jacket and examined its contents. 29 F.3d 6, 9 (1st Cir. 1994). By contrast, in United States v. Proctor, when an officer immediately recognized a bulge to be contraband during a pat-down search, the First Circuit held that the seizure was constitutionally permissible. See 148 F.3d at 43. Significantly, the Proctor court found it relevant that the arresting officer "testified that he was consistently able to determine the feel of marijuana from conducting numerous pat-downs of suspects." Id.

Here, prior to the pat-frisk, Detective Boyle had extensive knowledge of the fact that ten bags of heroin are frequently held together by a rubber band in a "bundle," and that dealers often carry one or more "bundles" of heroin to sell individual bags to the buyer. As a result, he was immediately able to recognize the bundle of heroin, held together with a rubber band, during the pat-frisk for firearms. It follows that this bundle, later confirmed to be heroin, was lawfully seized pursuant to the "plain-feel" doctrine. See id. at 43.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to suppress (Dkt. No. 42) is hereby DENIED.

It is So Ordered.

                                              /s/ Mark G. Mastroianni
                                              MARK G. MASTROIANNI
                                              United States District Judge